IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| AUTOMOTIVE PARTS DISTRIBUTION INTERNATIONAL, LLC[1], | § § § § § | CASE NO. 21-41655-ELM11<br><br>CHAPTER 11 |
| DEBTOR | | |

### FIRST-DAY DECLARATION OF KEVIN O'CONNOR IN SUPPORT OF PETITION AND FIRST-DAY MOTIONS

I, Kevin O'Connor, state and declare as follows:

1. I am over 18 years of age, and if called upon I would competently testify to the matters set forth herein from my own personal knowledge or from knowledge gathered from others within my review of relevant documents, or my opinion based upon my experience.

2. I am the Chief Executive Officer of Automotive Parts Distribution International, LLC. ("APDI" or the "Debtor").

3. Based on my personal knowledge of the Debtor, its business operations, history, industry, and the books and records and based upon information contained therein, I am qualified to give this declaration (the "First-Day Declaration") on behalf of the Debtor.

4. Some of the information presented below is based upon my knowledge and review of data regularly compiled by the Debtor in the ordinary course of its business.

5. I submit this First-Day Declaration in support of the Voluntary Petition (the "Petition") filed herewith, and the following motions (collectively, the "First-Day Motions"). Attached hereto as Exhibit A is a summary of each First-Day Motion and the relief requested therein, to wit:

---

[1] The last four digits of the Debtor's federal tax identification number are 8135. The Debtor's address is 3000 E. Pioneer Pkwy., Arlington, TX 76010.

**FIRST DAY DECLARATION OF KEVIN O'CONNOR IN SUPPORT OF PETITION AND FIRST DAY MOTIONS**
PAGE 1 OF 20

*(i) Emergency Motion for Order (I) Authorizing Debtor to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses; (II) Continuing Employee Benefits Programs; and (III) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(a), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004* (the "Wages Motion");

*(ii) Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Continue to Operate its Cash Management System, Bank Accounts, and Business Forms and (II) Granting Related Relief* (the "Cash Management Motion") and

*(iii) Emergency Motion for Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming the Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (this "Utility Motion").

# I.
# BACKGROUND

6. On July 12, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in this court (the "Bankruptcy Court") thereby initiating the above-captioned bankruptcy case (the "Bankruptcy Case") and creating its bankruptcy estate (the "Estate").

7. The Debtor continues to operate and to manage its business as "debtor-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the above-captioned bankruptcy case (the "Chapter 11 Case") pursuant to section 1104 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in the Chapter 11 Case at this time.

### A. Description of the Debtor

8. The Debtor is a Delaware limited liability company.

9. The Debtor is in the business of purchasing, warehousing, and distributing aftermarket automotive parts. The Debtor purchases inventory from China, Taiwan and other Asian markets and sells them on a wholesale basis to retailers in North America.

10. The member shares of the Debtor are wholly-owned by Fruitage International Co., Ltd., a Belize corporation ("Fruitage"). The shares of Fruitage are wholly-owned by Enterex International

Limited, a corporation and existing under the laws of the Cayman Islands ("Enterex"), and whose shares are publicly traded on the Taiwan Stock Exchange (TWSE).

11. The Debtor employs approximately 28 persons and its offices and warehouse are located in Arlington, Texas.

B. **The Debtor's Prepetition Capital Structure**

12. As of the Petition Date, on a book value basis, the Debtor owned had approximately $30.0 million in assets which consisted of approximately:

   i. $2.0 million in cash and cash equivalents;
   ii. $12.6 million in accounts receivable;
   iii. $9.3 million of inventory;
   iv. $2.8 million in property and equipment; and
   v. $3.3 million of other assets, such as NOL carry forwards related to tax returns.

13. As of the Petition Date, the Debtor had approximately $38.5 million of liabilities, which consisted of approximately:

   i. $5.2 million of trade accounts payable;
   ii. $24.1 million of inter-company debt to Debtor's parent-company, Fruitage International Co., Ltd.;
   iii. $2.1 million of Customer Program and Marketing Expense;
   iv. $4.2 million of accrued warranty expense; and
   v. $2.9 million of other liabilities, such as liabilities associated with Right of Use Assets.

C. **The Debtor's Financial Difficulties**

14. The Debtor's financial difficulties are threefold. First, the U.S.-imposed tariffs on goods imported from China result in the inflation in the cost of inventory imported by the Debtor. The Debtor conducts business in a very price-competitive environment, and the Debtor is simply unable to increase

its prices to account for the tariff-increased cost of its inventory.  Second, the Debtor has over a number of years incurred a sizable ($24.1M) liability to its parent-company, Fruitage which, in addition to its other costs and expenses, the Debtor finds increasingly difficult to service.  Finally, the Debtor lacks the liquidity and time to explore sourcing inventory from sources not currently subject to tariffs.

    **D.**    **Sale of Assets and Cessation of Operations**

15.    Under the foregoing circumstances, the Debtor, through its officers and through the efforts of its parent-company, considered alternatives for the recapitalization of the Debtor's business but because the primary cause of its financial challenges (the tariffs) cannot be avoided and cannot be mitigated by commensurate increases its the prices for its goods, the Debtor has determined that a restructuring or reorganization is not currently feasible.

16.    While making every effort to restructure its business, the Debtor was also negotiating with an unrelated third-party to purchase the Debtor's assets.  The result of these efforts is an Asset Purchase Agreement between the Debtor and Agility Auto Parts, Inc., a District of Columbia corporation ("Agility").  The proposed terms for the Debtor's sale of the Sale Assets are set forth in the Asset Purchase Agreement, a copy of which will be attached to a so-called "Sale Motion" to be filed within a few days after the Petition Date, but in essence, the terms are:

    a.    Agility will pay the Debtor $1.5 million in cash;

    b.    Agility will assume certain obligations of the Debtor, including accrued program, marketing and warranty expenses in an amount not to exceed $6.3 million;

    c.    Agility will accept the Debtor's assignment of the Debtor's real estate leases and other executory contracts, and pay all cure costs associated with the lease and such contracts; and

    d.    Agility will make good-faith offers to employ the non-officer employees of the Debtor,

in exchange for which the Debtor will sell and transfer to Agility substantially all of the Debtor's assets.

17. The conditions to Agility's obligation to close the sale pursuant to the terms set forth in the APA include: (a) the Debtor's delivery of an Order of the Bankruptcy Court, entered in the Bankruptcy Case, approving the APA and the sale, authorizing the Debtor to close the sale, and providing that the Debtor's assets shall be transferred to Agility free and clear of all claims, liens and encumbrances, and interests pursuant to sections 363 and 365 of the Bankruptcy Code; (b) Agility obtaining third-party financing for the cash component of the purchase price; and (c) the Debtor's compliance with certain milestones respecting bankruptcy court approval of the proposed sale.

18. The Petition was filed and this case commenced to comply with the foregoing condition.

19. It is anticipated that the Debtor may need to borrow funds to continue operations until closing of the proposed sale. Agility has expressed its interest to lend such funds to the Debtor on a first-priority secured basis, all of which will be brought before the court by appropriate motion.

20. As of the Petition Date, the Debtor has no other known prospective purchasers of its assets. The universe of suppliers for automotive parts sold at the retail level is fairly small. While competitors are a natural target for sale efforts, the Debtor's primary competitors have not been approached for similar but separate reasons: (a) *Competitor A* has been solicited by the Debtor's primary retail customers many times in recent years to quote competing bids to the customers only to consistently refuse to do so because of the complexity in doing business with the Debtor's retail customers; and (b) *Competitor B* owns retail locations throughout the country and therefore directly competes with the Debtor's retail customers. The Debtor's customers would not therefore support a sale to, or do business with, *Competitor B*. Other than the Debtor's competitors, the only other known viable purchaser of the Debtor's assets is a European company similar to the Debtor which previously purchased a division of Enterex International Limited, which is the holding company which owns the Debtor's parent company. This company expressed an interest in also purchasing the Debtor as part of a much larger transaction but negotiations for the U.S.-based assets faltered and the Debtor's assets were left out of the deal. Management of the Company will

provide information related to the proposed sale to Agility to determine whether the European company has any current interest in purchasing the Debtor's assets.

21. Upon closing of the proposed sale, the Debtor will cease all business operations.

## II.
## THE FIRST DAY MOTIONS

22. Contemporaneously herewith, the Debtor has filed the First Day Motions listed above seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, minimize the adverse effects of the commencement of these Chapter 11 Cases and facilitate the efficient administration of the Chapter 11 Case.

23. A summary of the First Day Motions is attached hereto as <u>Exhibit A</u>.

24. In connection with the preparation for this Bankruptcy Case, I have reviewed each of the First Day Motions. I believe that the entry of orders granting the relief requested in these Motions is critical to the Debtor's ability to continue in operation, and thus maximize the return to its creditors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## III.
## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 12, 2021

_____
Kevin O'Connor, Chief Executive Officer

**Exhibit A to First-Day Declaration**
**Summaries of First Day Motions[2]**

    A.    Wages Motion;

    B.    Cash Management Motion; and

    C.    Utility Motion;

### A. The Wages Motion

1. Through the *Emergency Motion for Order (I) Authorizing Debtor to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses; (II) Continuing Employee Benefits Programs; and (III) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(a), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004* (the "Wages Motion"). The Debtor requests the entry of interim and final orders, (i) authorizing, but not directing, the Debtor to (a) pay, in its sole discretion, all obligations incurred under or related to wages, salaries, other compensation, payroll taxes and deductions, reimbursable employee expenses, payroll benefit providers, employee benefits, and service fees (collectively, the "Employee Obligations"), and all costs related to the foregoing, and (b) maintain and continue to honor its practices, programs, and policies in place for its employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) authorizing and directing the Debtor's banks and financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations. The overwhelming majority of such claims would be entitled to priority treatment under section 507 of the Bankruptcy Code. None of the Debtors' employees have accrued prepetition wages in excess of the priority cap established by Bankruptcy Code section 507(a)(4), and the Debtors are not seeking payment of prepetition amounts in excess of the priority cap.

2. As of the Petition Date, the Debtor employs twenty-eight (28) full-time employees (the "Employees"), who are located in Texas, Pennsylvania, Connecticut, Illinois, Utah, and Canada. Eighteen (18) of the Employees are salaried Employees, and ten (10) of the Employees are paid hourly. Many of the Employees have specific skill sets and expertise that are essential to the Debtor's operations. The Employees are critical to the Debtor's operations, and without which all operations would cease. Additionally, the Employees responsible for the ongoing business operations, including distribution, field sales, customer service, purchasing, and other related tasks are equally as important to the business

operations. The Employees' skills, knowledge and understanding with respect to the Debtor's business operations, customer relations, and infrastructure are required for the effective sale of the Debtor's business.

### Employee Obligations

**Wages Obligations**

3. The Debtor typically pays obligations relating to Employee wages and salary on a biweekly basis. Bi-weekly payroll is processed and funded on every other Friday, and paid on every other Friday for the preceding two-week period.

4. In the ordinary course of business, the Debtor pays its Employees through direct deposit, by check, or in the case of its single Canadian-based employee, via ADP, LLC (a payroll company) ("ADP"). The Debtor's most recent bi-weekly payroll was funded on July 9, 2021, which covered the two-week time period ending on July 9, 2021. The Debtor's next scheduled payroll funding obligation is scheduled for July 23, 2021, which will cover the two-week time period from July 10, 2021 through July 23, 2021.

5. The Debtor estimates that, as of the Petition Date, approximately $7,700.00 in wages and salaries earned by the Employees prior to the Petition Date have accrued and remain unpaid (collectively, the "Unpaid Wage Obligations"). Additionally, as certain Employees are paid via check, the Debtor requests permission to honor Unpaid Wage Obligations for which checks were disbursed to the Employees but not yet presented to or honored by the relevant bank.

6. The Debtor does not believe that the Unpaid Wage Obligations owed to any one employee exceed the $13,650 priority cap imposed by Section 507(a)(4) of the Bankruptcy Code (the "Priority Wage Cap"). By the Wages Motion, the Debtor is *not* seeking to pay any Unpaid Wage Obligations on account of any prepetition work performed by any Employee in excess of the Priority Wage Cap. The Debtor seeks authority, but not direction, to pay all Unpaid Wage Obligations to the extent permitted by Section

507(a)(4) of the Bankruptcy Code and to continue to satisfy all Unpaid Wage Obligations in the ordinary course of business.

**Payroll Taxes and Deductions**

7. In various jurisdictions, the Debtor is required by law to withhold amounts from the Unpaid Wage Obligations related to income taxes, healthcare taxes, and other social welfare benefits, including Social Security, Medicare taxes, and unemployment insurance (collectively, the "Withholding Taxes"), and to remit the same and certain other amounts to the appropriate taxing authorities (collectively, the "Taxing Authorities") according to schedules established by such Taxing Authorities.

8. In certain circumstances, the Debtor is also required to make additional payments from its own funds in connection with the Withholding Taxes (the "Employer Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). As of the Petition Date, the Debtor estimates that it owes approximately $4,200.00 on account of prepetition Payroll Taxes.

9. During each applicable pay period, the Debtor withholds other amounts from certain Employees' gross pay, including garnishments, child support, and deductions related to various Retirement Plans and other Employee Benefits (each hereinafter defined) (collectively, the "Deductions" and, together with the Payroll Taxes, the "Payroll Taxes and Deductions"). As of the Petition Date, the Debtor estimates that it owes approximately $1,600.00 on account of prepetition Deductions.

10. To the extent any of the Payroll Taxes and Deductions may not have been forwarded to the appropriate third-party recipients or checks or electronic transfers in respect thereof may not have cleared prior to the Petition Date, the Debtor seeks authority to remit such Payroll Taxes and Deductions (and to continue to forward Payroll Taxes and Deductions on a post-petition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business.

**Reimbursable Expenses**

11. In the ordinary course of business, the Debtor reimburses certain Employees in accordance with the Debtor's policies for reasonable, customary, and approved expenses incurred on behalf of the

Debtor in the scope of such Employees' employment and service, including travel mileage, hotel rooms, meals, vehicle, equipment, and business-related telephone charges (collectively, the "Reimbursable Expenses"). The Debtor reimburses the Reimbursable Expenses as part of the scheduled payroll immediately following the Debtor's approval. Because of the irregular nature of requests for Reimbursable Expenses, it is difficult to determine the amount of Reimbursable Expenses outstanding at any given time. The Debtor estimates that Reimbursable Expenses average approximately $3,500.00 per month, and approximately $1,900.00 of Reimbursable Expenses may remain outstanding as of the Petition Date. The Debtor seeks authority, but not direction, to pay and honor the prepetition Reimbursable Expenses and to continue to honor the Reimbursable Expense obligations on a post-petition basis in the ordinary course of business.

**Vacation and Paid Time Off**

12. The Debtor provides the Employees with paid time off ("PTO") for vacation, illness, and other personal leave. Vacation accrues as of January of the current year and the available leave is dependent upon an Employee's length of employment (typically (2) two to (3) three weeks). Historically, the Debtor has paid Employees' accrued but unused PTO upon the termination of employment, but does not currently seek Court authority for payment of these amounts at this time. It is anticipated that any potential purchaser of the Debtor's assets will assume the accrued, but unused PTO obligation.

13. By the Wages Motion, the Debtor seeks authority to honor its respective vacation and other leave policies to all Employees in the ordinary course of the Debtor's business, but not pay accrued PTO, but unused, PTO, to employees ending their employment with the Debtor. The Debtor requests authority to permit its Employees to use accrued vacation and other leave in accordance with its prepetition policies.

**Benefit Services Providers**

14. The Debtor engages certain benefit service providers (each, a "Benefit Service Provider") to help administer payroll and provide other services. The scope of services provided varies from contract

to contract, but in each instance, the Debtor pays a fee to the Benefit Service Provider (the "Benefit Service Provider Fees").

15. As mentioned above, ADP is a Benefit Service Provider which facilitates the administration of payroll and payment of payroll taxes and deductions for the Debtor's Canadian employee.

16. As of the Petition Date, the Debtor owes approximately $20.00 on account of prepetition Benefit Service Provider Fees. The Debtor seeks authority to honor the prepetition Benefit Service Provider Fees and to satisfy all post-petition Benefit Service Provider Fees in the ordinary course of business.

**Employee Benefit Plans**

17. The Debtor maintains various employee benefit plans and policies for health care, dental, disability, life, secondary, accidental death and dismemberment insurance, and other programs (collectively, and as discussed in more detail below, the "Employee Benefits"). The Employee Benefits are administered by several different providers (collectively the "Benefits Providers"), depending upon the benefit.

18. As of the Petition Date, the Debtor owes approximately $38,900.00 on account of prepetition Benefit Service Providers. The Debtor pays a portion of the Employees' Employee Benefit premiums and the Employees pay the remainder of such amounts as payroll deductions The Debtor seeks authority to honor the prepetition Benefit Service Provider Fees and to satisfy all post-petition Benefit Service Providers in the ordinary course of business

19. Pursuant to the Wages Motion, the Debtor seeks authority, but not direction, to continue the Employee Benefits Programs in the ordinary course of business, and to make payments thereunder.

**Retirement Plans**

20. The Debtor also provides certain eligible Employees with retirement benefits. The Debtor maintains a retirement savings plan with Ascensus Trust Company for the benefit of all Employees who

meet the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is a defined contribution 401(k) profit-sharing plan and is compliant with ERISA Section 404(c). The Debtor matches the Employee's contributions to the 401(k) Plan, up to 2-percent of the Employee's wages. If the Employee does not contribute 2-percent of their wages to the 401(k), the Debtor matches all Employee contributions dollar-for-dollar, up to 2-percent. All amounts contributed to the 401(k) Plan are wired directly from the Debtor to Ascensus Trust Company.

21. Employees must make an election to participate in the 401(k) Plan. There are no age or service requirements for Employees to participate in the 401(k) Plan. As of the Petition Date, the Debtor estimates that the aggregate amount of unremitted employee and Debtor contributions to the 401(k) Plan is approximately $5,900.00 (the "Unremitted 401(k) Contributions"). Pursuant to the Wages Motion, the Debtor seeks authority, but not direction, to pay the Unremitted 401(k) Contributions.

**B.    The Cash Management Motion**

1. Through the *Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Continue to Operate its Cash Management System, Bank Accounts, and Business Forms and (II) Granting Related Relief* the "Cash Management Motion"),  the Debtor seeks interim and final orders authorizing, but not directing, continued use of the Cash Management System (as hereinafter defined).

**Overview.**

1. In the ordinary course of business, the Debtor maintains an integrated, centralized cash management system (the "Cash Management System") comparable to the cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.

2. The Debtor uses the Cash Management System in the ordinary course of business to collect, transfer, and distribute funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.

3. The Cash Management System includes a total of four (4) bank accounts. The Cash Management System is arranged to organize and monitor cash flows across the Debtor's enterprise and to

centralize procurement for general administrative and operating expenses. The Debtor estimates that its cash receipt collections averaged approximately $2 million per month. This amount, however, varies month to month.

4. Given the economic and operational scale of the Debtor's business, any disruption to the Cash Management System would have an immediate adverse effect on the Debtor's business and operations to the detriment of its estate and numerous stakeholders. Accordingly, to minimize the disruption caused by this Chapter 11 Case and to maximize the value of the Debtor's estate, the Debtor requests authority, but not direction, to continue to utilize its existing Cash Management System during the pendency of this Chapter 11 Case, subject to the terms described in the Cash Management Motion.

**The Cash Management System.**

5. The Cash Management System includes a total of four (4) bank accounts (each a "Bank Account" and collectively, the "Bank Accounts"), each of which is identified on **Exhibit A** attached to the Cash Management Motion. The Bank Accounts are located at Truist Bank, the successor-in-interest to Branch Banking & Trust (BB&T) and SunTrust Bank (collectively, the "Cash Management Banks"). As of the Petition Date, the Debtor has approximately $1.9 million in cash in the Bank Accounts.

6. The Debtor pays fees incurred in connection with the Bank Accounts, pursuant to the relevant agreement between the Debtor and the Cash Management Banks (the "Bank Fees"), to the Cash Management Banks on a monthly basis. The Bank Fees total approximately $3,000 per month. The Debtor does not believe that it owes any Bank Fees as of the Petition Date, but in the event such Bank Fees are owing, the Debtor seeks authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a post-petition basis, consistent with historic practice.

7. The Debtor uses various pre-printed documents (the "Business Forms"), such as checks, invoices, and letterhead, in the ordinary course of business. Because the Business Forms were used prepetition, they do not reference the Debtor's current status as debtor-in-possession. Nonetheless, most

parties doing business with the Debtor will be aware of the Debtor's status as debtor-in-possession as a result of the publicity surrounding this Chapter 11 Case and the notice of commencement served on parties-in-interest.

8. Requiring the Debtor to change existing Business Forms would unnecessarily distract the Debtor from its restructuring efforts and impose needless expenses on the estate. Thus, the Debtor requests that it be authorized to use its existing Business Forms without placing a "Debtor-in-Possession" legend on each, until its existing stock is depleted. Once the Debtor has exhausted its existing stock of checks or forms, any new check stock or subsequently printed checks or forms will bear the designation "Debtor-in-Possession" with the case number. To the extent that checks or forms are prepared electronically, the debtor will add a "Debtor-in-Possession" designation to such checks within fourteen (14) days of the Petition Date.

**Compliance with Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines.**

9. Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a Chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," § 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise. 11 U.S.C § 345(a)–(b).

10. Similarly, the U.S. Trustee's *Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines") generally require Chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with certain requirements of the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee").

**FIRST DAY DECLARATION OF KEVIN O'CONNOR IN SUPPORT OF PETITION AND FIRST DAY MOTIONS**
**PAGE 17 OF 20**

11. The Debtor will request all of the Cash Management Banks execute a depository agreement provided by the U.S. Trustee. The Debtor has no reason to believe at this time that its Cash Management System, as described above, does not comply with § 345 of the Bankruptcy Code. Nevertheless, to the extent that it may not comply with § 345 or any other requirements of the U.S. Trustee, the Debtor requests that this Court waive any such noncompliance because modifying the Debtor's Cash Management System would impose considerable costs to the Debtor's estate.

12. The Debtor's business and financial affairs are complex and require the collection, disbursement, and movement of funds through the Debtor's multiple Bank Accounts, enforcement of these provisions of the U.S. Trustee Guidelines during this Chapter 11 Case would severely disrupt the Debtor's operations. Accordingly, the Debtor respectfully requests that the Court allow it to operate each of the Bank Accounts listed on **Exhibit A** attached to the Cash Motion as they were maintained in the ordinary course of business before the Petition Date.

C. **Utilities Motion**

1. Through the *Emergency Motion for Interim and Final Orders: (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming the Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (this "Utilities Motion"), the Debtor seeks interim and final orders prohibiting utilities from altering, refusing, or discontinuing services, deeming such companies adequately assured of future performance, and establishing certain procedures related to additional adequate assurance.

2. The Debtor receives electricity, power, gas, internet, and telephone (the "Services") from numerous utilities (the "Providers"). A list identifying the Providers with relevant accounts for these companies is attached to the Utilities Motion as **Exhibit A**.[2]

---

[2] The listing of any entity on Exhibit A to the Utilities Motion is not an admission that any listed entity is a utility within the meaning of Section 366 of the Bankruptcy Code. The Debtor reserves all rights to further address the characterization of any

**FIRST DAY DECLARATION OF KEVIN O'CONNOR IN SUPPORT OF PETITION AND FIRST DAY MOTIONS**
**PAGE 18 OF 20**

3. Continued and uninterrupted use of the Services is vital to the Debtor's ability to sustain its operations during this Chapter 11 Case.

4. As described in **Exhibit A** to the Utilities Motion**,** as of the Petition Date, the Debtor owes pre-petition amounts to certain of the Providers, which could not be paid upon the filing of the bankruptcy. The Debtor intends to remain current on its post-petition obligations to the Providers by paying the Providers from cash on hand and from post-petition financing, if any. Sufficient amounts will be included in any budget(s) to pay such amounts on a current basis.

5. In light of the severe consequences to the Debtor and its assets if the Services were interrupted, but recognizing the right of the Services to evaluate the proposed adequate assurance, the Debtor will attempt to contact each of the Providers to discuss providing adequate assurance prior to a final hearing on the Utilities Motion. Consequently, the Debtor requests the Court enter an order approving and adopting the following procedures (the "Adequate Assurance Procedures"):

> i. As adequate assurance of future payment to each Provider listed in **Exhibit A** to the Utilities Motion, the Debtor proposes to pay, within fifteen (15) days after entry of the order granting the Utilities Motion, to the extent such payment has not already been made, each Provider, the amounts on **Exhibit A** to the Utilities Motion (the "Deposits"). The specific amount of each deposit is identified in **Exhibit A** to the Utilities Motion to the Utilities Motion. Each Provider will be deemed to have received adequate assurance of payment, as that term is used in Section 366 of the Bankruptcy Code;
>
> ii. In the event certain Services or Providers are inadvertently not included on the Utility Service List attached to the Utilities Motion, the Debtor proposes to provide, upon discovery of those Services or Providers, adequate assurance of future payment to each of those Providers not already holding a deposit, in an amount equal to the approximate aggregate cost of two (2) weeks of service. Each Provider will be deemed to have received adequate

particular entity listed on Exhibit A to the Utilities Motion as a utility company within the meaning of Section 366(a) of the Bankruptcy Code. The Debtor further reserves all rights to terminate the services of any Provider at any time and to seek an immediate refund of any utility deposit without effect to any right of setoff or claim asserted by a utility company against it. The relief requested herein is with respect to all of the Providers and is not limited to only those identified in Exhibit A to the Utilities Motion.

**FIRST DAY DECLARATION OF KEVIN O'CONNOR IN SUPPORT OF PETITION AND FIRST DAY MOTIONS**
**PAGE 19 OF 20**

      assurance of payment, as that term is used in Section 366 of the Bankruptcy Code;

iii. A Provider may not alter, discontinue, or refuse further service to the Debtor until and unless the Provider receives authorization from this Court;

iv. If at any time after the Petition Date the Debtor fails to pay a regularly billed utility payment invoiced post-petition by the Providers (a "<u>Post-Petition Utility Payment</u>"), such Provider shall provide the Debtor and its bankruptcy counsel written notice of such failure, outlining the account number for which such post-petition payment is due, as well as the amount of the missed payment. The Debtor shall have ten (10) days to cure such missed payment; and

v. At any time, the Debtor may terminate service from any Provider, such termination being effective immediately upon the Debtor's notice to the Provider. At such time, the Debtor shall not be required to make any further payments to such Provider for any services provided after such termination, and any excess deposit shall be returned within thirty (30) days.